## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| LAWRENCE PRAML, | Civil No. 05-581 (JRT/FLN) |
| Claimant, | |
| v. | MEMORANDUM OPINION AND ORDER ON ARBITRATION AWARD |
| LINSCO/PRIVATE LEDGER CORP. , | |
| Respondent. | |

Harvey H. Eckart and Amy M. Leonetti, **ECKART & LEONETTI, P.A.**, 366 Jackson Street, Suite 300, St. Paul, MN 55101, for claimant.

John J. McDonald, Jr. and Livia E. Babcock, **MEAGHER & GEER, P.L.L.P.**, 33 South Sixth Street, Suite 4200, Minneapolis, MN 55402, for respondent.

Claimant Lawrence Praml moves to confirm an arbitration award against his former investment advisers, respondent Linsco/Private Ledger Corporation. Respondent moves to vacate the portion of the award granting punitive damages. For the following reasons, the Court grants the claimant's motion and denies the respondent's motion.

## BACKGROUND

Claimant Lawrence Praml met with Dennis Snyder, an independent contractor and registered representative of respondent Linsco/Private Ledger Corporation to discuss investment of Praml's retirement savings in the fall of 1997. Praml told Snyder that he planned to retire in July 1998 and would be receiving one year's pay upon his retirement,

but would need to draw on his retirement savings for living expenses after that time. Praml wanted to invest his retirement savings so that it would grow and allow him to maintain adequate withdrawal levels.

According to Linsco, Praml and Snyder discussed Praml's goals and risk tolerance, the fluctuating nature of the markets, the dangers of invading the principal of Praml's investment by making excessive withdrawals, and the various types of investments available to Praml, including variable annuities and mutual funds. Because Praml did not want to pay front-end charges associated with mutual funds, Snyder recommended a variable annuity that imposed no upfront sales charge and allowed for various subaccounts that could be rebalanced without incurring transaction or sales charges. Snyder informed Praml that back-end charges could be incurred for surrendering the annuity and that a deferred sales charge would be incurred for withdrawing more than 10% of the original investment annually.

On March 24, 1998, Praml completed a Linsco new account application and an American Skandia variable annuity application. Praml invested his entire retirement savings of $523,701 in the American Skandia annuity, allocating that amount between four subaccounts that Praml and Snyder agreed were appropriate to Praml's goals and risk tolerance. The American Skandia annuity was issued on July 21, 1998. Over the next three and one-half years, Praml made significant withdrawals from the annuity, and also suffered sustained losses due to market performance. According to Linsco, several changes were discussed and made to the subaccount allocations in order to improve/maximize performance during that time. In February 2002, on Snyder's

recommendation, Praml transferred his remaining assets, which by that time had dropped to approximately $262,000, from the American Skandia annuity to an American Legacy variable annuity that Snyder felt would be better able to weather the market's downturn. The transfer triggered a surrender charge of $24,768 - 5% of Praml's initial investment. However, the new annuity offered a bonus payment of $8,689.66.  By February 2005, Praml's investment had declined to $110,483.   $336,163.53 of the loss was due to Praml's withdrawals, $52,286.61 was because of market decline, and $24,768 was lost to the surrender charge.

Linsco trains and supervises its registered representatives, including Snyder, on the sale and management of variable annuities.  Among other preventative measures, the compliance department performs regular audits of its representatives and offices and of random accounts in each office and requires its representatives to report sales involving more than 30% of the customer's net worth.  Praml's application and account were reviewed on several occasions by Linsco's compliance department, which on each occasion concluded that they were in order and being handled appropriately.

In accordance with the terms of his account agreement, Praml filed a Statement of Claim against Linsco with the National Association of Securities Dealers ("NASD"). The agreement submitting the matter to the NASD provides that the arbitration would proceed in accordance with the Constitution, By-Laws, Rules, Regulations and/or Code of Arbitration Procedure of the NASD.  The Statement of Claim alleged claims of respondeat superior, unjust enrichment, common law fraud, breach of contract, violation of the Minnesota Consumer Fraud Statute and Minnesota's blue-sky laws, and sought

damages stemming from the market losses and the surrender and withdrawal penalties. Praml alleged that Snyder recommended unsuitable investments and made material misrepresentations or omissions in order to induce him to switch annuities and, thereby, garner an additional commission. Praml's Statement of Claim reserved the right to seek punitive damages.

A two-day arbitration hearing was held on February 8-9, 2005. In his opening statement, Praml sought damages and stated that he intended to seek punitive damages. During the trial, Praml presented evidence in support of his allegation that Snyder irresponsibly sold variable annuities to customers, including Praml, for whom they were unsuitable and routinely suggested switching annuities, rather than simply adjusting existing investments, resulting in increased commissions. Praml also presented evidence that although Linsco went through the motions of supervising Snyder, it ignored multiple red flags connected to his performance. Linsco presented evidence that Snyder carefully advised Praml on the various investments available and remained aware of and responsive to Praml's investment needs, that Linsco monitored and supervised Snyder's work on Praml's account, and that Praml's losses were the result of Praml's excessive withdrawals and unpredictable market conditions. At the close of evidence, Praml orally requested to amend the Statement of Claim to add a claim for punitive damages and requested punitive damages in some multiple of the surrender penalty. The arbitrators found in favor of Praml and awarded him $91,581 in compensatory damages plus interest, attorneys' fees and costs, and $247,680 in punitive damages.

Linsco moves to vacate the punitive damages portion of the arbitration award. Linsco asserts that the arbitrators exceeded their authority, manifestly disregarded the law, and contravened explicit public policy by awarding punitive damages despite Praml's failure to follow Minnesota procedure for seeking punitive damages and a lack of evidence supporting the award, and by making a grossly excessive award.

## ANALYSIS

## I.    STANDARD OF REVIEW

Strong federal policy supports the enforcement of arbitration agreements, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983), and an arbitration award must be enforced unless vacated under one of a very limited number of statutorily or judicially recognized grounds. 9 U.S.C. § 9. The Federal Arbitration Act ("FAA") permits vacating an arbitration award if (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption among the arbitrators; (3) the arbitrators were guilty of misconduct or any other misbehavior by which the rights of any party were prejudiced; or (4) the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. 9 U.S.C. § 10(a). Additionally, the Eighth Circuit has recognized "two extremely narrow judicially created standards for vacating an arbitration award." *Schoch v. InfoUSA, Inc.*, 341 F.3d 785, 788 (8th Cir. 2003). Specifically, an award may be vacated if the award is "completely irrational" in that "it fails to draw its essence from the agreement," or if the award "evidence[s] a manifest disregard for the law." *Id.* (citation omitted). Finally, in very limited circumstances, an award may be

vacated if its enforcement would violate an explicit, well-defined, and dominant public policy. *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983).

"The Supreme Court and the Eighth Circuit have repeatedly emphasized that the scope of a district court's review of an arbitration award is 'extremely limited,'" and that the underlying award is entitled to an extraordinary level of deference. *Green Tree Fin. Corp. v. Alltell*, 2002 WL 31163072, at *3 (D. Minn. Sept. 26, 2002) (citation omitted). Under any of the standards articulated above, the court is not permitted to reconsider the merits of the award "simply because [the court] might have interpreted the agreement differently or because the arbitrators erred in interpreting the law or in determining the facts." *Schoch*, 341 F.3d at 790 (citation omitted). Rather, the court must confirm the award "even if [the court is] convinced that the arbitrator committed serious error, so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Id.* at 788 (citation omitted). The court accords even greater deference to the arbitrator's decisions on procedural questions than it does on substantive questions. *El Dorado Sch. Dist. No. 15 v. Cont'l Cas. Co.*, 247 F.3d 843, 846-47 (8th Cir. 2001).

## II.    SCOPE OF THE ARBITRATORS' AUTHORITY

Under Minnesota law,

[u]pon commencement of a civil action, the complaint must not seek punitive damages. After filing the suit a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis . . . for awarding punitive damages in the action and must be accompanied by one or more affidavits showing the factual basis for the claim. At the hearing on the motion, if the court finds prima

> facie evidence in support of the motion, the court shall grant the moving
> party permission to amend the pleadings to claim punitive damages.

Minn. Stat. § 549.191.  The requirements are intended to afford a defendant "adequate time in which to prepare a defense."  *Rosenbloom v. Flygare*, 501 N.W.2d 597, 601 (Minn. 1993).   According to Linsco, Praml's failure to comply with this aspect of Minnesota procedural law deprived the arbitrators of the authority to consider any claim for punitive damages.  Accordingly, Linsco reasons, the arbitrators' award of punitive damages exceeded their authority.  The Court disagrees.

The scope of an arbitrator's authority is defined by the contract providing for arbitration.  *EEOC v. Wafflehouse, Inc.*, 534 U.S. 279, 289 (2002).  The Supreme Court has emphasized on a number of occasions the FAA's "primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989).  Given this policy, "[j]ust as [parties] may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted."  *Id.* (citations omitted).  Thus, "if contracting parties agree to include claims for punitive damages within the issues to be arbitrated, the FAA ensures that their agreement will be enforced according to its terms even if a rule of state law would otherwise exclude such claims from arbitration."  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 58 (1995).

In *Mastrobuono* the Supreme Court noted that the NASD's Rules and Code of Arbitration Procedure "strongly impl[y] that an arbitral award of punitive damages is appropriate" eve n where the contract also includes a choice of law provision that could be

read to preclude the availability of punitive damages.  *Id*. at 60-61.  In that case, the Supreme Court ultimately harmonized the conflict between the NASD Rules and Procedure and the potentially conflicting New York state law by reading the two provisions to "encompass substantive principles that [state] courts would apply, but not to include special rules limiting the authority of arbitrators."  *Id.*

In this case, as in *Mastrobuono*, the new account application and agreement provided that any controversy between the parties "shall be settled by arbitration in accordance with the rules then obtaining of the National Association of Securities Dealers, Inc."  (Babcock Aff. Ex. 6.)  The NASD Code of Arbitration Procedure does not contain any special requirements for pleading punitive damages.   (available at www.nasd.org.)   Neither the application and agreement, the Code of Arbitration Procedure, nor the NASD Rules specify that the arbitration will be governed by Minnesota law.  Furthermore, even if Minnesota law were explicitly applicable, the pleading requirements are not substantive.  Therefore, the Court finds that Minnesota's procedural requirements cannot be read into the arbitration agreement so as to prevent the arbitrators' consideration of punitive damages.   Accordingly, the arbitrators' consideration and award of punitive damages did not exceed the scope of their authority.[1]

---

[1] Furthermore, the Court notes that Linsco "did not challenge" Praml's request to add a claim for punitive damages or raise the arbitrators' authority to award punitive damages to the arbitrators.  (Babcock Aff. Ex. 1.)  Rather Linsco "argue[d] that the punitive damages were not warranted" under the evidence presented.  *Id.*  The Court agrees with a number of other courts that a party that fails to raise either lack of authority or the existence of contrary legal authority to the arbitrators, who are charged in the first instance with determining the scope of their authority, cannot later raise the issue before the court as a basis for vacating the award.  *See Wallace v. Buttar*, 378 F.3d 182, 197 (2d Cir. 2004); *Jeppsen v. Piper, Jaffray & Hopwood, Inc.*,

(Footnote continued on next page.)

## III.    MANIFEST DISREGARD FOR THE LAW

An arbitration award "manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it."  *Schoch*, 341 F.3d at 788 (citation omitted).  "[T]here must be some showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it."  *Marshall v. Green Giant Co.*, 942 F.2d 539, 550 (8th Cir. 1991).  "Where the arbitrators' decision does not clearly delineate the law applied or the reasoning underlying a decision, it cannot be assumed that the arbitrators 'identified applicable law and proceeded to reach a contrary position in spite of it.  Nor does the absence of express reasoning by the arbitrators support the conclusion that they disregarded the law.'"  *FSC Secs. Corp. v. Freel,* 811 F. Supp. 439, 445 (D. Minn. 1993) (*citing Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 750 (8th Cir. 1986)).  It may constitute a manifest disregard for the law to award punitive damages absent *any* factual evidence to support the award.  *See Glennon v. Dean Witter Reynolds, Inc.*, 83 F. 3d 132, 139 (6th Cir. 1996); *see also Wallace*, 378 F.3d at 193 ("the Second Circuit does not recognize manifest disregard of the evidence as proper ground for vacating an arbitrator's award. … if a ground for the

_____

(Footnote continued.)

879 F. Supp. 1130, 1136-37 (D. Utah 1995).  To permit a party to raise to the district court arguments or issues not raised before the arbitrators would defeat the policy favoring arbitration and run contrary to the deference owed to an arbitrators' determination.  This is in keeping with the long-standing appellate rule that ordinarily a court will not consider arguments raised for the first time on appeal.  *See Wiser v. Wayne Farms*, 411 F.3d 923, 927 (8th Cir. 2005) (finding that party waived choice of law argument by not presenting it to the district court).

arbitrator's decision can be inferred from the facts of the case, the award should be confirmed.").

### A.    Procedural Law

Linsco complains that Praml did not make a motion prior to the arbitration hearing and did not present the required affidavit or other evidence in support of the motion, thereby denying it notice of the claim and the opportunity to prepare a defense. Linsco argues that the arbitrators manifestly disregarded the Minnesota law requiring Praml to take such steps. The Court determined in section II, *supra*, that the arbitrators were not bound by Minnesota procedural law concerning punitive damages. Praml's failure to comply with Minnesota procedural law cannot, therefore, constitute a manifest disregard for the law.

### B.    Substantive Law

Under Minnesota law, punitive damages are allowed "only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20. "Deliberate disregard for the rights or safety of others," as used in the punitive damages statute, requires the defendant to (a) have knowledge of facts or intentionally disregard facts that create a high probability of injury to the rights of others and (b) either deliberately act in conscious or intentional disregard of the high degree of probability of injury to the right of others or deliberately act with indifference to the high probability of injury to the rights of others. *Id.*, subd. 1(b).

Punitive damages may be imposed against a principal for the acts of an agent if (a) the principal authorized the doing and the manner of the act, (b) the agent was unfit and the principal deliberately disregarded a high probability that the agent was unfit, (c) the agent was employed in a managerial capacity with the authority to establish policy and make planning level decisions for the principal and was acting in the scope of that employment, or (d) the principal ratified or approved the act while knowing of its character and probable consequence. *Id.*, subd. 2.

Initially, Linsco contends that Praml only claimed that Snyder acted with deliberate disregard for his rights. Thus, according to Linsco, in order to collect punitive damages from Linsco, Praml was required to demonstrate Linsco's vicarious liability for Snyder's actions. Additionally, Linsco disputes both that Snyder's actions rose to the level of deliberate disregard and that Linsco could be vicariously liable for those actions - in part because, according to Linsco, vicarious liability is not applicable to independent contractor situations.

Linsco asserts that the evidence presented during the arbitration demonstrated that Snyder met with Praml multiple times, reviewed various investment options, explained the advantages and requirements of variable annuities, assisted Praml in selecting subaccount options and in switching them when appropriate, reminded Praml that excessive withdrawals would result in penalty charges, and, based on research, attempted to help Praml switch his poorly performing annuity for an option that, even after the surrender charge, would better serve Praml. Furthermore, Linsco reviewed and supervised Snyder's actions on Praml's account and determined that they were

- 11 -

appropriate.  Linsco argues that this evidence establishes conclusively that neither Snyder nor Linsco acted with deliberate disregard for Praml's financial wellbeing and that, as a matter of law, Linsco cannot be either directly or vicariously liable for punitive damages.

According to Praml, Snyder glossed over many of the negative aspects of variable annuities and failed to seriously discuss Praml's goals and risk tolerance in favor of emphasizing how much money Praml could make in high risk investments.  Despite the fact that Linsco's internal guidelines stated that variable annuities were not appropriate for all people, and that investing more than 30% of a customer's net worth in an annuity was a questionable strategy, Snyder sold variable annuities to almost all, if not all, of his clients and placed high percentages of his clients' investments in the annuities.  Furthermore, Snyder needlessly recommended that his clients, including Praml, switch annuities rather than simply realign investments within the existing annuity.  Although Linsco was aware of all of these transactions, Linsco did not take action to more closely monitor Snyder or otherwise protect Praml or Snyder's other clients.   Rather, Linsco ignored red flags concerning Snyder's performance, including complaints from multiple clients than eventually led Linsco to decline to renew Snyder's contract.  Praml argues that this evidence is sufficient to constitute clear and convincing evidence of both Snyder's and Linsco's deliberate disregard for Praml's rights.

The award in this case states that Linsco "did not challenge" Praml's request to add a punitive damages claim, "but did argue that the punitive damages were not warranted."  (Babcock Aff. Ex. 1.)  The arbitrators then awarded Praml "$247,680 in punitive damages pursuant to Minn. Stat. § 549.191," which describes the procedural

requirements for adding a claim for punitive damages and refers to the section that describes the substantive requirements for awarding direct and vicarious punitive damages. *Id*.

The Statement of Claim states that both "the direct acts and omissions of [Linsco] and those of its agent Snyder constitute fraudulent and deceptive acts in connection with the sale of securities." (Babcock Aff. Ex. 2.) Therefore, the arbitrators could have awarded punitive damages against Linsco directly or based on vicarious liability. It is unclear whether the arbitrators awarded direct or vicarious punitive damages. However, in light of the arbitrators' reference to appropriate Minnesota law and the existence of at least some evidence in the record supporting Praml's allegations that Linsco failed to police Snyder's work and enforce its own policies designed to protect clients despite indications that it needed to do so, Linsco has failed to demonstrate that the arbitrators both recognized and ignored the law regarding either direct or vicarious punitive damages by making an unsupported award. Even if this Court might have made a different decision based on the evidence presented, it is not the Court's place to second-guess the arbitrators' determination that the evidence presented by Praml was clear and convincing. *See Bobker*, 808 F.2d at 933 (manifest disregard "means more than error or misunderstanding with respect to the law.").

## IV.    PUBLIC POLICY

There is no broad judicial power to set aside arbitration awards as against public policy. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987). Rather, in very limited circumstances, a court may vacate an arbitration award where

enforcement of the award would violate some explicit, well-defined, and dominant public policy. *See id.* at 43. Linsco argues that the punitive damages award in this case violates the public policies behind Minnesota's procedural and substantive punitive damages laws. Assuming that these policies are of the sort that could support vacation of an arbitration award, *see id.* (noting that obedience to judicial orders and voluntary compliance with Title VII qualify, but finding that a common sense public policy against the operation of dangerous machinery while under the influence of drugs did not qualify), the Court finds that the award does not violate the public policies behind the laws. As noted above, the arbitration panel reasonably concluded that it was permitted to award punitive damages and that such damages were appropriate. Because the Court has not found that the laws themselves have been violated, it also cannot find that the policies behind the laws have been violated. Furthermore, the Court finds that Praml's Statement of Claim and opening statement to the arbitrators provided Linsco with adequate notice of his intent to seek punitive damages in accord with the policy behind Minnesota's procedural requirements.[2]

## V.      GROSSLY EXCESSIVE

Linsco asserts that the punitive damages award, which was ten times the surrender penalty and approximately two and a half times the total compensatory damages award is grossly excessive as a matter of law under *BMW of North America v. Gore*, 517 U.S. 559

---

[2] Additionally, the Court notes that if the public policy exception can be read as broadly as Linsco urges, then the requirement that an award be not just contrary to the law, but manifestly against the law, would be essentially null.

(1996). The Court finds, especially in light of the evidence in the record suggesting that Snyder affirmatively misrepresented information to Praml in order to collect additional commissions and that Snyder and Linsco were indifferent to the potential long-term impact that inappropriate investment advice could have on Praml's future, the award in this case does not run afoul of *Gore*. *See id.* at 576, 581 (discussing aggravating factors related to economic harm and appropriate ratios between compensatory and punitive damages awards).

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Respondent's motion to vacate or modify arbitration award [Docket No. 3] is **DENIED.**

2.     Claimant's motion to confirm arbitration award [Docket No. 6] is **GRANTED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:   September 20, 2005                    _____ s/ John R. Tunheim _____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                                 United States District Judge